**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DORA ANN HAUN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 2:15-cv-71** |
| | ) | |
| **v.** | ) | **Magistrate Judge Lisa Pupo Lenihan** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY ADMINISTRATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

### I.     Introduction

Plaintiff Dora Ann Haun ("Haun") brings this action pursuant to 42 U.S.C. § 1383(c)(3),

seeking judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying her application for supplemental security income ("SSI") benefits

under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1383f.  The matter is

presently before this Court on cross-motions for summary judgment filed by the parties pursuant

to Federal Rule of Civil Procedure 56.  (ECF Nos. 10 & 16).  The record has been developed at

the administrative level.[1]  For the reasons that follow, Haun's motion for summary judgment

(ECF No. 10) will be denied, the Commissioner's motion for summary judgment (ECF No. 16)

will be granted, and final judgment will be entered in favor of the Commissioner and against

Haun.

### II.     Statement of the Case

#### A.     Procedural History

Haun protectively filed an application for SSI benefits on August 12, 2011, alleging that

her disability began February 1, 2011.  (R. at pp. 165-71, 216).  Her application was initially

---

[1] All references to the administrative record, (ECF No. 6), will be cited in the following format: (R. at p. xx).

denied on January 11, 2012. (R. at pp. 187-99). Haun responded by filing a request for an administrative hearing, (R. at p. 112), which was then scheduled for March 27, 2013. (R. at p. 129).

The hearing was held on its scheduled date before Administrative Law Judge ("ALJ") Daniel Cusick. (R. at pp. 32-75). Haun testified at the hearing, represented by counsel. (R. at pp. 34-69). James Primm, M.Ed. ("Primm"), an impartial vocational expert, also provided testimony concerning the nature of jobs and expectations of employers existing in the national economy. (R. at pp. 69-74). In a decision dated May 9, 2013, the ALJ determined that Haun was not "disabled" within the meaning of the Act. (R. at p. 27). Following her receipt of the ALJ's decision, Haun filed a request for its review with the Appeals Council on July 12, 2013. (R. at p. 7). This request was denied on December 4, 2014, making the ALJ's decision the final decision of the Commissioner. (R. at pp. 1-5). Haun commenced this action on January 20, 2015, seeking judicial review of the Commissioner's decision. (ECF No. 2). Haun and the Commissioner filed cross-motions for summary judgment on April 17, 2015 and July 13, 2015, respectively, (ECF Nos. 10 & 16), each also filing a brief in support thereof, (ECF Nos. 11 & 17). These pending motions for summary judgment are now ripe for disposition.[2]

### B.    General Background

Haun was born on August 8, 1963, making her forty-seven years of age on her alleged disability on-set date and forty-nine years of age at the time of the hearing. (R. at pp. 38, 165). She attended high school through the eleventh grade and later earned her GED. (R. at p. 40).

---

[2] The Court acknowledges that judicial review under the Act is not governed by the standards generally applicable under Federal Rule of Civil Procedure 56. Banks v. Shalala, 43 F.3d 11, 13-14 (1st Cir. 1994); Flores v. Heckler, 755 F.2d 401, 403 (5th Cir. 1985). In this context, the procedure typically employed at the summary-judgment stage of litigation "merely serves as a convenient method under which both parties may present appropriate briefs in support [of] and in opposition to the[ir] respective positions." Sumler v. Bowen, 656 F.Supp. 1322, 1330 (W.D. Ark. 1987).

She is currently single, but has several adult children.  (R. at p. 39).  She does not have a residence of her own and spends time living with either her son, daughter, or sister, as at the time of the hearing.  (Id.).

Haun has not worked since either 2009 or 2010 when she was fired from a job at the fast food chain Wendy's.  (R. at pp. 42, 220-21).  She stated at the hearing that she was fired after missing work to seek medical attention for chest pains.  (R. at pp. 42-43).  She also previously worked as a cashier and became a certified nurse's aide in 1994.  (R. at pp. 41, 221).  Haun testified that she has applied to a few jobs since Wendy's, but has not had any luck and is limited because of her arm and shoulder pain.  (R. at p. 43).  Her alleged impairments include fibromyalgia, arthritis, major depressive disorder, anxiety/panic disorder, dependent and avoidant personality disorders, and Post Traumatic Stress Disorder ("PTSD").  (R. at pp. 44-47).

### C.    Medical History

In 2009, complaining of chest pain, Haun visited the ER at UPMC Horizon in Greenville, Pennsylvania; her stress test was normal.  (R. at p. 321).  In June 2011 Haun received treatment at Magee-Women's Hospital, where she underwent gynecological surgery to remove atypical squamous cells.  (R. at pp. 309-12).  She appears to have undergone an additional surgery in September 2011 to treat cervical stenosis and dysplasia which were causing pelvic pain.  (R. at pp. 349-50).    Relevant to the present inquiry, Haun established care with Dr. Briana Yee-Providence M.D. ("Yee-Providence"), in August 2011.  (R. at p. 321).  On her first visit, Haun reported chronic generalized pain, fibromyalgia, arthritis, and depression/anxiety.  (Id.).  She further reported that the fibromyalgia had not been treated with any medications lately.  (Id.).  Yee-Providence assessed fatigue with fibromyalgia and significant depression, and started Haun

on Amitriptyline.  (R. at p. 322).  She also prescribed physical/occupational therapy for neck pain.  (Id.).

Haun began physical therapy on September 2, 2011.  (R. at p. 402).  After several sessions and multiple no-shows and cancellations, Haun was discharged from physical therapy in November 2011, and when contacted, indicated that she did not wish to continue with it.  (R. at p. 417).  When Haun complained of numbness in her left arm, Yee-Providence sent her to radiology for x-rays of her cervical spine.  (R. at p. 353).  The films were normal and showed no change from 2009.  (Id.).

Jill Materna, Psy.D. ("Materna") performed a clinical psychological disability evaluation on October 19, 2011.  (R. at p. 359).  Haun reported to Materna that she had struggled with depression since she was a child.  (Id.).  As a result of her depression she reported diminished interest in normal daily activity, a decrease in appetite, sleep disruption, diminished ability to concentrate, and poor self-esteem.   (R. at pp. 359-60).  She also reported suicidal ideation with no plan or intent.   (R. at p. 360).  Haun also indicated a panic disorder with four to five panic attacks per week.  (Id.).  Haun reported taking Trazodone, Mobic, Flexeril, and Chantix, all prescribed by Yee-Providence the previous month.  (Id.).  She indicated that she suffered no significant negative side effects, but that these medications have not helped her depression or anxiety.  (R. at p. 361).

On mental status examination, Haun correctly performed serial 7s up to 91; spelled the word "world" backwards; was oriented to time, place and situation; had average short term memory, immediate recall, and normal memory of both recent and remote events; had normal judgment and good insight; but had a limited fund of knowledge and low average intelligence.  (R. at p. 362).  She also displayed normal attention and concentration, but Materna noted that she

could have problems at times due to anxiety.  (Id.).  Materna found her facial expressions to be "sad and anxious" and her attitude "cooperative, but somewhat passive."  (R. at pp. 362-63).  Materna diagnosed major depressive disorder and panic disorder, and also noted avoidant and dependent personality traits.  (R. at p. 363).  She assigned Haun a Global Assessment of Functioning ("GAF") score of 35.[3]  (Id.).

Haun reported that because of her depression and anxiety, she typically stays at home and rarely goes out except when she must.  (R. at p. 362).  Haun indicated that she tends to keep to herself and has not formed many meaningful relationships.  (R. at p. 363).  However, Haun denied having any problems with coworkers or authorities in the past.  (R. at p. 361).  Haun told Materna that she is able to shop for groceries, do light cooking, pay bills, maintain her personal hygiene, and babysit her grandchildren; but had limited ability to clean her home due to her fibromyalgia.  (R. at pp. 361, 363).  She further told Materna that she could focus on a task for ten to fifteen minutes, she has to reread written directions but can generally follow same, and that her concentration is impaired.  (R. at p. 364).  Materna checked off that Haun had no difficulty understanding, remembering, and carrying out short, simple instructions; slight difficulty carrying out detailed instructions, making judgments on work-related decisions, and interacting appropriately with the public; moderate difficulty interacting appropriately with supervisors and co-workers and responding to changes in a routine work setting; and marked difficulty responding appropriately to pressures in a usual work setting.  (R. at p. 365).

---

[3] The GAF scale assesses an individual's psychological, social, and occupational functioning and ranges from 1 to 100, with 100 being the highest functioning.  American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).  A GAF score between 31 and 40 may indicate impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  Id.  A GAF score between 41 and 50 may indicate serious symptoms or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id.

In October 2011 Haun starting going to Paoletta Counselling Services ("Paoletta") for therapy; her therapist was Cheryl Wild, M.Ed. ("Wild"). (R. at p. 386). The treatment plan dated October 28, 2011 and signed in November by Haun, Wild, and a psychiatrist, diagnoses Haun with depression and anxiety disorder and rules out PTSD. (R. at p. 420). Wild assessed a GAF score of 50. (Id.). In January 2012 Haun saw Ronald McFadden, M.D. ("McFadden") at Paoletta. (R. at pp. 427-28). On mental status examination, he noted that Haun was alert and oriented but downcast and her affect was congruent. (R. at p. 428). He assessed major depressive disorder and dependent personality traits, and ruled out PTSD. (Id.). He assigned a GAF score of 50 and recommended Haun increase her dosage of Effexor and continue with the same dosage of Trazodone. (Id.).

In November 2011, Iftikhar Chatha, M.D. ("Chatha") performed a physical consultative examination at the request of the state agency. (R. at pp. 367-73). Chatha describes Haun as "very pleasant," "neatly dressed," fully alert, and capable of expressing herself without difficulty. (R. at pp. 369-70). Haun indicated to Chatha that she began experiencing generalized body pain in 2006. (R. at p. 367). She said that the pain eases up at times but that she is never pain free, that she can barely walk a block, can lift fifteen pounds, can climb easily, and can drive. (R. at p. 368). Chatha observed local discomfort around her left shoulder, chest, and side. (R. at p. 370). However, he also noted that all shoulder movements were normal and full range. (Id.). Haun's movement of her elbows, wrists, hands, and fingers were also fully normal, with 5/5 grip strength. (R. at pp. 370-71). Chatha noted "[m]ild local discomfort at the sacroiliac and gluteal area" but found her hip movement to be fully normal, as were her knee and ankle joints. (R. at p. 371). Examination of Haun's spine showed mild local discomfort in the left side of the

neck, the lumbosacral area, and right gluteal area; but that movement was fully normal with no kyphosis or scoliosis and good musculature.  (Id.).

In the "Daily Activity" section, Chatha noted that Haun can lift and carry twenty pounds, and can walk and stand for about one or two hours until she starts to have pain.  (R. at p. 372). Chatha also noted that "[s]he can sit less than 6 hours and has to change the position because of the pain."  (Id.).  Pushing and pulling is limited in the upper extremities but her lower extremities can push and she can bend, kneel, stoop, crawl, balance, and climb, but only for three to four hours.  (Id.).  Additionally, Haun has no limitations in reaching and handling and she can walk without assistance and does not use or have a cane.  (Id.).  During the exam Haun had no difficulty getting on and off the exam table, could walk on her heels and toes, had no difficulty getting up from a squatting position, and 5/5 motor power.  (Id.).  Chatha concluded that Haun has a "[m]ild form of fibromyalgia" and a "[m]ild form of depression."  (R. at pp. 372-73).

State agency experts who examined Haun's medical records, Roger Glover, Ph.D. ("Glover") and Gregory P. Mortimer, M.D. ("Mortimer"), both concluded that Haun's impairments were not sufficiently severe as to render her disabled.  See (R. at pp. 92-98).

In January 2012, Haun saw Yee-Providence for a routine follow-up.  (R. at pp. 440-44). She reported noticing a "little bit improvement" but that she had only been on medication for about a week.  (R. at p. 440).  Specifically, Haun indicated that her depression was "significantly improved" and her anxiety was somewhat improved, but her fibromyalgia was not, and that it caused generalized pain that was worst in her back.  (Id.).  She indicated she had no other concerns at the time.  (Id.).  Yee-Providence recommended a rheumatology consultation.  (R. at p. 441).

Haun began seeing rheumatologist Praveen Jajoria, M.D. ("Jajoria") as a new patient referral in February 2012. (R. at p. 513). Haun reported back, hip, wrist, and hand pain for the past twenty years, which she rated an eight or nine out of ten. (Id.). She said Mobic did not relieve her pain, but that ice, heat, and Flexeril provided some relief. (Id.). Haun also reported non-restorative sleep and fatigue. (Id.). Jajoria's physical examination revealed tender points over the inferior occiput, trapezius, SI region, and trochanteric region. (R. at p. 515). Jajoria found Haun had a normal gait; intact motor strength and sensation; normal range of motion and no tenderness in her shoulders, elbows, and knees; and minimal Bouchard's and Heberden nodes in her hands, but otherwise good fist making and grip. (Id.). Jajoria concluded that Haun's case was "complicated" and posited several possible explanations for her pain. (R. at p. 517). He ordered bloodwork, injected Haun's hip, and added Tramadol and Tylenol to her pain medications. (Id.).

Haun followed up with Jajoria several weeks later. (R. at p. 525). She had no new complaints and reported some improvement of her symptoms since starting the Tramadol, as well as some improvement in the hip which received the localized steroid injection. (Id.). Results of the physical examination remained largely the same, except that Jojoria no longer found tenderness in the injected hip but did note some tenderness in her left AC joint. (R. at pp. 527-28). He recommended that Haun continue with her medications and start using Capzasin cream. (R. at p. 528). He also recommended that Haun quit smoking. (Id.).

Haun saw Yee-Providence in March 2012, during which they mostly discussed her complaint of chest pains. (R. at pp. 505-08). She followed up again in April 2012. (R. at pp. 492-95). Aside from elevated blood pressure, Yee-Providence noted that Haun "continues to do well" and that "[o]verall, I think she is doing fine." (R. at p. 492). Haun reported that she has

been seeing a rheumatologist and that he prescribed Flexeril, Mobic, Ultram, Capzasin cream, and Trazodone. (R. at pp. 492-93). She reported moderate improvement in her pain symptoms and that she was feeling better overall. (Id.). Yee-Providence also noted that Haun indicated she was still seeing a psychiatrist and going to counseling and that her "[d]epression is much better." (R. at p. 493).

In May 2012, Haun returned to Jajoria for a routine follow-up. (R. at pp. 533-37). She again reported some improvement with Tramadol, but had run out recently and felt worse as a result. (R. at p. 533). Jajoria's physical examination notes remained unchanged from Haun's previous visit. (R. at p. 536); see (R. at pp. 527-28). Jajoria refilled her prescriptions and suggested a follow-up in three months. (R. at p. 537).

Haun returned to Yee-Providence for a routine follow-up on July 27, 2012. (R. at pp. 486-89). The visit was uneventful with regard to the medical issues relevant to the present inquiry. She returned to Jajoria for a routine follow-up in August 2012. (R. at p. 544). Haun reported "some improvement" but that she still had pain. (Id.). Jajoria's physical examination remained the same. (R. at p. 547). Jajoria recommended that Haun continue with her medication, quit smoking, and try yoga and Tai-chi. (R. at pp. 548-49).

Paoletta Counselling records indicate that as of August 2, 2012, Haun had attended forty out of forty-one scheduled therapy appointments. (R. at p. 431). Wild, her therapist, noted that Haun has made "excellent progress" during the treatment period, (R. at p. 433), and that her communication skills have improved, in part, due to her attendance of Al-Anon meetings (R. at p. 435). After approximately one year of counselling, Wild and McFadden assessed a GAF score of 60. (R. at p. 434).

Haun continued to have appointments with Yee-Providence through the end of October 2012, which were uneventful with regard to the present inquiry (R. at pp. 468-80).  A December 2012 follow-up with Jajoria likewise yielded nothing new.  (R. at pp. 552-57).

### D.     The Administrative Hearing

At the hearing before the ALJ on March 27, 2013, Haun testified that her pain from the fibromyalgia is nearly constant and rated it seven out of ten.  (R. at p. 45).  She further testified that she experiences particularly severe pain and swelling in her left shoulder and neck, and that she has a difficult time bending down and getting back up and holding her arms up for any length of time.  (R. at pp. 45-46).  She indicated that her fibromyalgia pain is exacerbated the more active she is, such as when she spends the day with her grandchildren.  (R. at p. 46).  Haun testified that she gets migraines approximately four or five days a week and that they last between one and three days each.  (R. at p. 47).  She takes Excedrin Migraine which helps "sometimes" and has to lie down in a quiet, dark room.  (R. at p. 48).  She rates the migraine pain ten out of ten and her arthritis pain as ranging from eight to ten out of ten.   (R. at pp. 48-50).

Haun testified about the effects of her depression, including that she cries at least once a day and has suicidal thoughts.  (R. at pp. 51-52).  She briefly discussed her PTSD which she attributed to things that have happened with her family in the past.  (R. at pp. 52-53).  She testified that her anxiety leads to panic attacks when she has to deal with people she does not like, and that there are "just some people [she] can't talk to" as a result of her personality disorders.  (R. at pp. 53-54).

She testified that she cannot walk much and estimated that after walking one hundred feet she probably needs to sit and rest for ten to fifteen minutes.  (R. at p. 56).  Haun also indicated that she can only stand for thirty minutes at a time and can only sit for one hour at a time.  (R. at

pp. 56-57). She has no friends with whom she keeps in touch but she talks to her kids and grandkids regularly. (R. at p. 56). Regarding daily life, Haun testified that she goes to the grocery store on occasion, watches her grandchildren several days a week, dresses herself, does her own laundry and some cooking and cleaning. (R. at pp. 55, 60-62). She also testified that she borrowed her sister's car and drove herself to the hearing. (R. at p. 56). When questioned by her attorney, Haun elaborated that roughly three to four days a week she is unable to help with cooking and cleaning because her pain is so bad. (R. at pp. 63-64). She also stated that her emotional problems cause her to spend a lot of time in her room by herself, cancel appointments frequently, and have a difficult time dealing with people. (R. at pp. 63-65).

### E. The ALJ's Opinion

After consideration of the above, as well as testimony by the vocational expert, the ALJ determined that Haun was not "disabled" within the meaning of the Act. (R. at p. 27). The ALJ determined that Haun had the following severe impairments: fibromyalgia, depression, an anxiety disorder, and a personality disorder. (R. at p. 13). Based on these impairments, the ALJ determined that Haun has the residual functional capacity ("RFC") to:

> perform medium work as defined in 20 CFR 416.967(c), lifting fifty pounds occasionally and up to twenty-five pounds frequently, except that she can stand, walk and sit up to six hours in an eight hour work day; and is limited to performing simple, routine, repetitive tasks; with only simple work decisions or changes, with no production rate or pace work, and can have only occasional contact with the public and only occasional interaction with co-workers, with no tandem tasks and only occasional contact with supervisors.

(R. at p. 17). Based on this RFC, the ALJ determined that Haun could not perform any past relevant work. (R. at p. 25). However, based on testimony by Primm, Haun could perform jobs existing in significant numbers in the national economy, including vehicle cleaner, night cleaner, and laundry worker. (R. at p. 26).

In formulating the RFC, the ALJ found Haun's testimony as to the intensity, persistence, and limiting effects of her symptoms to be not entirely credible given the following. First, the clinical data from her treatment providers "did not reflect the severity of symptoms that would be disabling" and that her fibromyalgia was "reasonably controlled" with treatment. (R. at p. 24). Second, despite complaints that Haun's neck pain was eight or ten out of ten and that she suffered from migraines eighty percent of the week, a cervical spine x-ray came up negative and there was no diagnosis of migraines at all. (Id.). Third, Haun "is still able to perform significant activities of daily living, including driving, caring for personal needs, caring for her grandchildren, preparing simple meals and doing light household chores." (Id.). The ALJ also noted that Haun's "poor work record is indicative of a lack of motivation to work . . ." (Id.).

The ALJ gave significant weight to the assessments of Chatha, Glover, and Mortimer which signaled that Haun's impairments were not significantly limiting and that she could work. (R. at pp. 23-24). The ALJ found these opinions to be consistent with the medical evidence of record. (Id.). In doing so, the ALJ gave "little weight" to select findings of Materna, which he found to be "inconsistent with the other medical evidence of record." (R. at p. 23).

### III.    Standard of Review

This Court's review is plenary with respect to all questions of law. Schaudeck v. Commissioner of Social Security Administration, 181 F.3d 429, 431 (3d Cir. 1999). With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of

the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." Stunkard v. Secretary of Health & Human Services, 841 F.2d 57, 59 (3d Cir. 1988); Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his ultimate findings, an ALJ must do more than simply state factual conclusions. He must make specific findings of fact. Stewart v. Secretary of Health, Education & Welfare, 714 F.2d 287, 290 (3d Cir. 1983). The ALJ must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence.

Weir on Behalf of Weir v. Heckler, 734 F.2d 955, 961 (3d Cir. 1984); Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively-delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court has summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003) (footnotes omitted). Factual findings pertaining to all steps of the sequential evaluation process are subject to judicial review under the "substantial evidence" standard. McCrea v. Commissioner of Social Security, 370 F.3d 357, 360-61 (3d Cir. 2004).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. Securities & Exchange Commission v. Chenery Corp., 332 U.S. 194, 196 (1947) (if the "grounds [relied on by the agency] are inadequate or improper, the court is

powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.").  The Third Circuit Court of Appeals has recognized the applicability of this rule in the Social Security disability context.  Fargnoli v. Massanari, 247 F.3d 34, 44, n.7 (3d Cir. 2001).  Thus, the Court's review is limited to the four corners of the ALJ's decision. Cefalu v. Barnhart, 387 F.Supp.2d 486, 491 (W.D. Pa. 2005).

**IV.     Discussion**

Haun raises two sets of arguments in support of her motion for summary judgment.  First, she argues that the ALJ failed to adequately consider certain medical evidence in the record. (ECF No. 11, at pp. 5-11).  Second, Haun contends that the ALJ failed to adequately explain why he found her testimony to be less than fully credible.  (Id. at pp. 11-14).  Neither of these arguments is compelling.

**A.     The ALJ adequately considered the medical record and supported his decision with substantial evidence**

Haun points to two pieces of medical evidence which she avers support her claim of disability and that the ALJ failed to properly consider: (1) the GAF scores assessed by McFadden, Wild, and Materna; and (2) Chatha's finding that she cannot sit for a full six hours. (Id. at pp. 9-11).

Courts have consistently held that "[l]ow GAF scores, standing alone, are never enough to satisfy the claimant's burden to show that he is disabled."  Wuerger v. Colvin, 2013 WL 2254244, at *14 (W.D. Pa. 2013); Clayton v. Colvin, 2014 WL 5439796, at *7 (W.D. Pa. 2014); see also Gilroy v. Astrue, 351 Fed.App'x 714, 716 (3d Cir. 2009).  Similarly, "[a]n ALJ's failure to include a GAF score in his or her discussion is considered to be harmless error where a claimant has not explained how the GAF score would have itself satisfied the requirements for disability in light of potentially contradictory evidence on record."  Bracciodieta-Nelson v.

Comm'r of Soc. Sec., 782 F.Supp.2d 152, 165 (W.D. Pa. 2011) (citations omitted); see also

Liggitt v. Comm'r of Soc. Sec., 2011 WL 2458054, at *11 (W.D. Pa. 2011) report and

recommendation adopted, 2011 WL 2445861 (W.D. Pa. 2011) (holding same).

Here, Haun has offered no explanation for how the GAF scores, standing alone, would

satisfy the requirements for disability. Haun received GAF scores of 50 from both Wild and

McFadden, (R. at pp. 420, 428), and 35 from Materna, (R. at p. 363). Nevertheless, the records

of all three professionals contain precious little else to support Haun's claim that her mental

illnesses severely impair her social functioning. The ALJ does not specifically mention the GAF

score assessed by Materna. However, he discusses Materna's examination at length and rejects

the only finding in the report that indicates Haun might have significant difficulty working – that

Haun was markedly limited in responding appropriately to normal workplace pressures – as

inconsistent with the other medical evidence of record. (R. at p. 23). Indeed, the ALJ details

Materna's own findings that Haun's ability to perform activities of daily living, social activities,

concentration, persistence and pace were all satisfactory. (Id.). As well as Materna's findings

that Haun was only slightly to moderately limited in dealing with supervisors and coworkers and

in reacting and responding to changes in routine work settings. (Id.). As discussed by the ALJ,

this limitation finding by Materna is also contradicted by the opinions of Glover and Mortimer

who concluded that Haun's mental impairments were not severely limited and that she was

capable of working. (R. at pp. 23-24). The ALJ gave the opinions of Glover and Mortimer great

weight since they were based on, and consistent with, the records of Haun's mental health

treatment providers. (Id.); see Myers v. Barnhart, 57 Fed.App'x 990, 996 (3d Cir. 2003) ("an

ALJ can choose to accept the findings of evaluating non-examining state agency physicians over

the opinions of treating physicians where the treating physicians' opinions were 'conclusory and

unsupported by the medical evidence' and contradictory to other medical evidence of record.")

(quoting Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991)).

The ALJ does mention that Haun was assessed a GAF score of 50 at Paoletta Counseling, although he does not specify that same score was assessed separately by both Wild and McFadden. See (R. at p. 23). The ALJ points out that neither Wild nor McFadden offered an opinion on whether Haun could work. (Id.); see Liggitt, 2011 WL 2458054, at *11 (ALJ may disregard GAF scores where the records do not contain the reasons for assignment of the particular scores or where the score is not accompanied by evidence that it impairs the claimant's ability to work) (collecting cases). The Third Circuit has observed that a GAF score of 50 is indicative that a claimant can "perform some gainful activity."[4] See Hillman v. Barnhart, 48 Fed.App'x 26, 29 n. 1 (3d Cir. 2002). Furthermore, the ALJ clearly accommodated a slight to moderate difficulty in social and workplace functioning in creating the RFC. See (R. at p. 25) (limiting Haun to work involving only simple, routine tasks and decisions and only occasional contact with the public, coworkers, and supervisors). For all of these reasons, the Court finds no error in the adequacy of the ALJ's consideration of the GAF scores.

Haun also argues that despite giving Chatha's opinion great weight, the ALJ failed to consider Chatha's finding that she cannot sit for six hours, thus rendering her incapable of working an eight hour workday. (ECF No. 11, at pp. 10-11). It is true that the ALJ gave Chatha's opinion great weight, (R. at p. 23), and that Chatha noted that Haun "can sit less than 6 hours and has to change the position because of the pain." (R. at p. 372). However, the Court finds no error in the ALJ's implicit rejection of that particular finding.

---

[4] This Court also notes that the latest edition of the American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-5) no longer uses the GAF scale, a fact federal courts are beginning to recognize in social security decisions. See e.g., Tuulaupua v. Colvin, 2015 WL 5769984, at *4, n.4 (W.D. Pa. 2015); Solock ex rel. F.A.R.P. v. Astrue, 2014 WL 2738632, at *6 (M.D. Pa. 2014).

"[N]o rule or regulation compels an ALJ to incorporate into an RFC every finding made by a medical source simply because the ALJ gives the source's opinion as a whole 'significant' weight." Wilkinson v. Comm'r of Soc. Sec., 558 Fed.App'x 254, 256 (3d Cir. 2014). In Wilkinson, the Third Circuit found no error in the ALJ's failure to incorporate, without explanation, postural limitations simply because he otherwise gave the medical source great weight, where the ALJ relied on that source "in conjunction with" other sources and evidence that conflicted with the postural limitation. See id.

Here, the ALJ relied on ample other evidence besides Chatha's report in formulating the RFC. As an initial matter, that particular finding is inconsistent with the rest of Chatha's report, and which contains no explanation for such a finding. See generally (R. at pp. 367-73) (describing Haun's symptoms as mild and finding her generally capable of doing nearly everything else evaluated). In formulating the RFC, the ALJ also considered Mortimer's conclusion that Haun was capable of performing unskilled work and the clinical data of the treating physicians which "did not reflect the severity of symptoms that would be disabling." (R. at p. 24). As part of this conclusion, the ALJ noted that Haun's fibromyalgia problems were "reasonably controlled" with treatment. (Id.). Review of the notes from Haun's treating physicians, Yee-Providence and Jajoria, supports the ALJ's assessment that her symptoms are not of disabling severity. See supra. Accordingly, the ALJ's RFC formulation is supported by substantial evidence and the Court finds no error with the ALJ's rejection of the lone finding from Chatha's report regarding Haun's ability to sit.

**B.      The ALJ adequately explained and supported his credibility determination**

Haun's second argument is that the ALJ failed to adequately explain why he found her testimony to be less than fully credible. (ECF No. 11, at pp. 11-14). She avers that the medical evidence and her complaints to her doctors match her testimony at the hearing. (Id.). In so

arguing, Haun points specifically to the ALJ's characterization of her testimony regarding her daily activities and his rejection of her testimony regarding her migraines. (Id.). This argument is also not compelling.

Courts generally afford significant deference to an ALJ's credibility determination. Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003) (noting that the Court would "ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor."). "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence he rejects and the reasons for discrediting such evidence." Fickes v. Colvin, 2014 WL 438468, at *4 (W.D. Pa. 2014) (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000)).

There is no question that Haun's testimony portrayed her symptoms as extremely severe. See generally (R. at pp. 45-65). Nevertheless, the ALJ found that "[Haun] experiences anxiety and certain residual effects from her depression and fibromyalgia, but the medical evidence does not reflect objective signs and findings of abnormality to corroborate symptoms and functional limitations of the severity alleged." (R. at p. 24). As already discussed, the ALJ looked at several different sources in concluding that Haun's symptoms were "reasonably controlled" and relatively mild. Tellingly, Haun's brief does not point to any specific medical evidence that corroborates her testimony regarding the severity of her symptoms (besides possibly that which the Court has already addressed.) The Court's own review of the record, particularly the notes of Haun's treating physicians, yields nothing that obviously contradicts the ALJ's assessment. Rather, Yee-Providence and Jajoria's notes support the ALJ's conclusion that while Haun does suffer to a degree, her symptoms are not of the severity alleged at the hearing.

The ALJ's evaluation of Haun's credibility also noted that she remains "able to perform significant activities of daily living, including driving, caring for personal needs, caring for her grandchildren, preparing simple meals and doing light household chores." (R. at p. 24). It is proper for an ALJ to consider a claimant's activities of daily living in determining that his or her testimony regarding the severity of symptoms lacks credibility. Russo v. Astrue, 421 Fed.App'x 184, 190 (3d Cir. 2011). Haun counters by arguing that the ALJ mischaracterized her daily activities. (ECF No. 11, at p. 13). She points out that while she did testify that she sometimes performs the activities described by the ALJ, she also testified – when questioned by her attorney – that there are several days per week that her symptoms are so bad that she cannot perform same. (Id.). As already discussed, the ALJ supported his decision to discount Haun's testimony regarding the severity of her symptoms with substantial medical evidence. Accordingly, the Court also finds no error in the credibility determination as it relates to Haun's daily activities. See Liggitt, 2011 WL 2458054, at *11 (finding that while the ALJ has a duty to accurately portray claimant's daily functioning, there was no error in the ALJ's rejection of portions of her testimony regarding daily functioning that were unsupported by the medical evidence).

Lastly, Haun takes issue with the ALJ's use of her testimony regarding migraines in an attempt to "discredit" her. (ECF No. 11, at p. 12). The ALJ noted that Haun claimed to suffer from incapacitating migraines with a frequency and duration that amounted to eighty percent of the time, despite there being no diagnosis of migraines in the record and in fact only one passing reference to "nonspecific" headaches by a doctor that saw her once. (R. at p. 24). The ALJ concluded that this "demonstrates to me a level of exaggeration of symptoms." (Id.). To support her assertion that this was somehow improper, Haun cites a Ninth Circuit case which found that an ALJ should not draw inferences from a claimant's failure to seek treatment without first

considering any explanations the claimant may provide, such as an inability to pay. (ECF No. 11, at p. 12) (citing <u>Orn v. Astrue</u>, 495 F.3d 625, 638 (9th Cir. 2007)). Here, Haun proffered no such explanation. Inability to pay is seemingly inapplicable where the ALJ's point was Haun's failure to so much as mention the headaches at doctors' appointments she was already paying to attend. More importantly, the Court finds the ALJ's credibility determination was supported by substantial evidence even ignoring the migraine comment entirely.[5]

## V.    <u>Conclusion</u>

For the foregoing reasons, Haun's motion for summary judgment (ECF No. 10) will be denied, the Commissioner's motion for summary judgment (ECF No. 16) will be granted, and the Commissioner's decision will be affirmed.


Dated:  January 29, 2016                        ___s/Lisa Pupo Lenihan___
                                                LISA PUPO LENIHAN
                                                U.S. Magistrate Judge


cc:     All Counsel of Record

---

[5] Haun similarly takes issue with the ALJ's comment that her "poor work record is indicative of a lack of motivation to work . . ." (ECF No. 11, at p. 12). Once again, the Court finds the ALJ's credibility determination was supported by substantial evidence even ignoring this consideration. Additionally, there is nothing improper about the ALJ taking her work record into account. <u>Victor v. Colvin</u>, 2015 WL 2232031, at *6 (W.D. Pa. 2015) (citing 20 C.F.R. § 416.929(c)(3)).